Michael Van McDOUGALL,
Petitioner–Appellant,

v.

Gary DIXON, Respondent–Appellee.

No. 88–4003.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 9, 1988.

Decided Dec. 19, 1990.

James C. Fuller, Jr., Thorp, Fuller & Slifkin, P.A., Raleigh, N.C., argued (Margaret E. Karr, Thorp, Fuller & Slifkin, P.A., Raleigh, N.C., Richard A. Rosen, University of North Carolina School of Law, Chapel Hill, N.C., on brief), for petitioner-appellant.

Barry Steven McNeill, Asst. Atty. Gen., N.C. Dept. of Justice, Raleigh, N.C., argued (Lacy H. Thornburg, Atty. Gen., N.C. Dept. of Justice, Raleigh, N.C., on brief), for respondent-appellee.

Before PHILLIPS, CHAPMAN and WILKINS, Circuit Judges.

CHAPMAN, Circuit Judge:

Michael Van McDougall appeals the district court's denial of his petition for a writ of habeas corpus. He claims errors of constitutional dimension in his trial which resulted in his convictions of felonious assault, kidnapping and first degree murder, and his sentence of death imposed as a result of the murder conviction. His claims of error are:

1. That the jury instructions at the sentencing phase violated his right under *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), to have the jury consider all of his mitigating evidence when making its sentencing decision.

2. That the district court refused to allow him to introduce evidence in the form of opinions from certain professors in the fields of Anthropology, English, Philosophy, Psychology, Communications and Rhetoric as to how the jury instructions would have been understood by a reasonable juror.

3. That the jury instructions in the sentencing phase unconstitutionally interfered with the jury's consideration of non-statutory mitigating circumstances.

4. That his death sentence was unconstitutionally imposed because at the time of his trial North Carolina juries were permitted to return verdicts to the lesser included offense of second degree murder when there was no evidence to support such a verdict.

5. That the conduct of his lead trial attorney was so outrageous that he was denied a fair trial as required by the Sixth, Eighth and Fourteenth Amendments.

Finding no error, we affirm.

I

A detailed account of the facts supporting the conviction is set forth in *State v. McDougall*, 308 N.C. 1, 301 S.E.2d 308, *cert. denied*, 464 U.S. 865, 104 S.Ct. 197, 78 L.Ed.2d 173 (1983), so we provide only a summary that may assist in framing the issues.

In the early morning hours of August 21, 1979, McDougall rang the doorbell at the home of his neighbors, Vicki Dunno and Diane Parker, who lived together at 1420 Blueberry Lane, Charlotte, North Carolina. He begged to be admitted and claimed that his wife had cut her leg badly and he needed alcohol and bandages for her, and that he needed to call a doctor. Miss Parker took alcohol and bandages and placed

them outside the back door and then went back to the front of the house where appellant began calling her by name and saying that he needed to talk to her because he needed help for his wife. He explained that he was her neighbor, Mike, and continued to plead to get into the house. Unfortunately, Diane Parker let McDougall into the house. They went into the kitchen where Vicki Dunno was checking the telephone directory for a doctor's number. While this was going on, defendant walked from the kitchen into the den and began to "check out the house." At this point Diane Parker took the telephone book from Vicki Dunno and started to dial for help. McDougall returned to the kitchen and picked up a butcher knife. He then grabbed Diane by the arm and put the knife in front of her face and told her to put down the telephone. A struggle developed and Diane told Vicki to run next door and get help. Vicki ran out to the front yard but she slipped on wet grass, and in the course of falling, lost her glasses. While she was looking for her glasses, McDougall came out of the house and told Vicki that she was not going anywhere, and another struggle ensued. Diane came out of the house holding a knife, and McDougall took the knife from her. After another struggle he grabbed the two women by their hair and dragged them back into the house. At the time McDougall was 6'2" tall and weighed about 220 pounds; Vicki was 25 years of age, 5'10" tall and weighed 130 pounds; and Diane was 27 years of age, 5'2" tall and weighed 125 pounds.

McDougall demanded the car keys, and when they were delivered, he forced both women back outside and told them he was going to put them in the trunk. Vicki then threw the keys away, and McDougall threw her to the ground and began to stab her. Vicki screamed to Diane to run for help. She ran but McDougall caught her and stabbed her 22 times. Two of these wounds were to the heart and medical evidence established that most of the wounds occurred while she was in a prone position. There were also defensive cuts about her hands. Diane Parker's body was found in the yard of McDougall's home. The butcher knife, which was found at the scene, was identified as the murder weapon.

While McDougall was chasing Diane, Vicki Dunno dialed the emergency number, 911, and police arrived and began looking for McDougall. When they brought in search lights, McDougall came from behind some bushes saying, "I give up. Okay, I give up." There was blood smeared on his person, his shirt and pants and a blood analysis showed that this blood matched the blood type of the deceased.

Shortly after McDougall's arrest, his family retained Charlotte attorney Wallace Osborne to represent him. Because of his limited experience in criminal cases, Osborne associated Attorney Michael Scofield with McDougall's consent. Mr. Scofield had considerable criminal experience and had been an Assistant United States Attorney in the Western District of North Carolina and a Public Defender for Mecklenburg County, North Carolina. The attorneys arranged to send McDougall to a psychiatric hospital for mental evaluation, and to secure information about his amnesia, since he claimed no memory of the events of August 21, 1979. While at the hospital McDougall was treated by Dr. Stephan S. Teich, a psychiatrist, and Courtney Mullin, a "juristic psychologist", both of whom were privately retained. These individuals had previously been associated with Attorney Jerome Paul in the defense of other criminal cases and they urged McDougall to retain Attorney Paul for his defense. After meeting with Attorney Scofield, McDougall and his family, Paul was retained in May 1980 to represent appellant together with Attorneys Scofield and Osborne. All three attorneys participated in the three-week trial, which included the guilt and the sentencing phases, and resulted in the death sentence now under attack.

At trial, the defense contended that McDougall suffered a cocaine induced psychosis, underlying depression and organic brain damage. He was alleged to have injected himself with cocaine on the night of the murder, and he claimed amnesia as to all events surrounding the crimes. He

did not testify in the guilt phase of the trial but he did testify during the sentencing phase.

The appellant's guilt of the murder of Diane Parker is not an issue in the present appeal. The evidence of guilt was overwhelming.

During the sentencing phase, it was established that McDougall had been convicted of rape in March 1974, and that prior to stabbing Diane Parker to death, he had stabbed Vicki Dunno. Defendant introduced evidence that he was present, as a young boy, when his grandfather committed suicide, and since that event he has experienced hallucinations and heard his grandfather's voice. He also contended that he suffered from cocaine induced psychosis, organic brain damage and depression, and that at the time of the murder, he thought he was fighting his mother, who was hitting him with an automobile radio antenna.

At the conclusion of the evidence, the oral arguments and the charge in the sentencing phase, the trial judge submitted to the jury a verdict form containing four questions, with the first two questions having four subparts each. This is entitled "Issues and Recommendation as to Punishment" and is set forth below with the answers given by the jury.

## ISSUES

1. Do you find from the evidence, beyond a reasonable doubt the existence of one or more of the following aggravating circumstances?

ANSWER: Yes

a. Has the defendant previously been convicted of a felony involving the use of violence to the person?

ANSWER: Yes

b. Was the murder in this case committed for the purpose of avoiding or preventing a lawful arrest?

ANSWER: No

c. Was the murder in this case especially heinous, atrocious, or cruel?

ANSWER: Yes

d. Was the murder in this case part of a course of conduct by the defendant which included the commission by the defendant of another crime of violence against another person?

ANSWER: Yes

2. Do you find from the evidence the existence of one or more of the following mitigating circumstances?

ANSWER: Yes

a. Was the murder in this case committed while the defendant was under the influence of mental or emotional disturbance?

ANSWER: Yes

b. Was the defendant's capacity to appreciate the criminality of his conduct or his capacity to conform his conduct to the requirements of law impaired?

ANSWER: Yes

c. Was the age of the defendant at the time of the murder in this case a mitigating factor?

ANSWER: No

d. Is there any other circumstance or circumstances arising from the evidence which you deem to have mitigating value?

ANSWER: Yes

3. Do you find, beyond a reasonable doubt, that the mitigating circumstance or circumstances you have found is or are insufficient to outweigh the aggravating circumstance or circumstances you have found?

ANSWER: Yes

4. Do you find beyond a reasonable doubt that the aggravating circumstance or circumstances you have found is or are sufficiently substantial to call for the imposition of the death penalty?

ANSWER: Yes

## RECOMMENDATION AS TO PUNISHMENT

We, the jury, unanimously recommend that the defendant, Michael Van McDougal, be sentenced to Death. (Indicate your recommendation by writing "Life Imprisonment" or "Death".)

## II(a)

■ Appellant contends that the jury instructions as to sentencing interfered with the jury's consideration of mitigating circumstances and resulted in a mandatory death sentence. He specifically claims that the instructions violated his right under *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), to have the jury consider all of his mitigating evidence. Appellant concedes that there was a strong case of aggravation, but he argues that there was also a strong case of mitigation. He claims the jury could not, under the charge, consider the mitigating evidence in making its ultimate sentencing decision in answer to the fourth question, unless it found the mitigating circumstances outweighed the aggravating circumstances. He argues that under the jury instructions, if the mitigating circumstances did not outweigh the aggravating circumstances, such mitigation would not be considered by the jury and would violate the *Lockett* requirement that:

> The Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

*Id.* at 604, 98 S.Ct. at 2964–65 (footnotes omitted).

McDougall also claims that the fourth question should have included a requirement that the jury consider mitigating circumstances again when answering this inquiry. He buttresses this argument with the decision of the Supreme Court of North Carolina in his original appeal, *McDougall*, 301 S.E.2d at 327, which requires that in future trials the fourth question should read:

> (4) Do you find beyond a reasonable doubt that the aggravating circumstance or circumstances found by you is, or are, sufficiently substantial to call for the imposition of the death penalty *when considered with the mitigating circumstance or circumstances found by you?*

(New language underlined.)

However, the Supreme Court of North Carolina did not find prejudicial error at McDougall's trial as a result of the trial court's failure to include the phrase "when considered with the mitigating circumstance or circumstances found by you" in the body of the fourth question. The court merely stated that the inclusion of this language "more appropriately framed" the fourth issue and should thereafter be used.

Appellant also argues that the sentencing charge violated his due process rights because it instructed the jury that it had a "duty" under certain circumstances to give an affirmative answer to question 4 and make a recommendation of death.

The instruction as to issues 3 and 4 provided:

> The third issue for your consideration reads as follows:
>
> 3. Do you find, beyond a reasonable doubt, that the mitigating circumstance or circumstances you have found is or are insufficient to outweigh the aggravating circumstance or circumstances you have found?
>
> On this issue the burden is upon the state to prove to you from the evidence beyond a reasonable doubt that the mitigating circumstances you find are insufficient to outweigh any aggravating circumstances you may have found.
>
> If you find from the evidence one or more mitigating circumstances, you must weigh the aggravating circumstances against the mitigating circumstances. In so doing, you are the sole judges of the weight to be given to any individual circumstance which you find, whether aggravating or mitigating. Your weighing should not consist of merely adding up the number of aggravating circumstances and mitigating circumstances. Rather, you must decide from all of the evidence what value to give to each circumstance, and then weigh the aggravating circumstances, so valued, against the mitigating circumstances, so valued, and finally determine whether the aggravat-

ing circumstances outweigh the mitigating circumstances.

So then, Members of the Jury, if the State has proven to you from the evidence beyond a reasonable doubt that the mitigating circumstances you find are insufficient to—that is, do not—outweigh the aggravating circumstances you find, it would then be your duty to answer this third issue "Yes." However, if you do not so find, or if you have a reasonable doubt, then it would be your duty to answer this issue "No."

If you answer this issue "Yes," then you would come to consider the fourth issue. If you answer this issue "No," it would be your duty to recommend that the defendant be sentenced to life imprisonment.

The fourth issue for your consideration reads as follows:

4. Do you find beyond a reasonable doubt that the aggravating circumstance or circumstances you have found is or are sufficiently substantial to call for the imposition of the death penalty?

On this issue the burden is on the State to prove to you from the evidence beyond a reasonable doubt that the aggravating circumstances found, if any, are sufficiently substantial to call for the imposition of the death penalty.

Substantial means having substance or weight, important, significant or momentous. Aggravating circumstances may exist in a particular case and still not be sufficiently substantial to call for the death penalty. Therefore, it is not enough for the State to prove from the evidence beyond a reasonable doubt the existence of one or more aggravating circumstances. It must also prove beyond a reasonable doubt that such aggravating circumstances are sufficiently substantial to call for the death penalty, and before you may answer "Yes," you must agree unanimously that they are.

If you unanimously find beyond a reasonable doubt that any aggravating circumstance or circumstances found by you are sufficiently substantial to call for the death penalty, you would answer this issue "Yes." If you do not so find, or have a reasonable doubt, then you would answer this issue "No."

If you answer this issue "No," it would be your duty to recommend that the defendant be imprisoned for life.

So then, Members of the Jury, finally I instruct you for you to recommend that the defendant be sentenced to death, the State must prove three things beyond a reasonable doubt, as I have defined that term, from the evidence:

FIRST, that one or more statutory aggravating circumstances existed; and,

SECOND, that the mitigating circumstances found by you are insufficient to outweigh the aggravating circumstances, if any, found by you; and,

THIRD, that the aggravating circumstances, if any, found by you are sufficiently substantial to call for the imposition of the death penalty.

. . . .

If the State has proven these three things to you beyond a reasonable doubt, and you unanimously so find, it would be your duty to recommend that the defendant be sentenced to death. If you do not so find, or if you have a reasonable doubt to one or more of these things, it would be your duty to recommend that the defendant be sentenced to life imprisonment.

Appellant misreads *Lockett* and the clear language and meaning of the jury instructions given. There has been no showing that McDougall was limited in any way in his presentation of evidence as to mitigation. Nothing proffered by him was excluded by the trial judge.

*Lockett* involved the Ohio death sentence statute which the Supreme Court found to be unconstitutional because it too narrowly limited the sentencer's discretion to consider the circumstances of the crime and the record and character of the offender as mitigating factors. There is no limitation under North Carolina law, or under the jury instructions given, upon the sentencer's discretion as to what it may consider as circumstances in mitigation, and the jury

is allowed to and was instructed in this case to consider every circumstance. The trial court instructed as to mitigating circumstances:

2. Do you find from the evidence the existence of one or more of the following mitigating circumstances?

A mitigating circumstance is that circumstance arising from the evidence which does not constitute a justification or excuse for a killing, or which reduces it to a lesser degree of crime than first-degree murder, but which nevertheless may be considered as extenuating or reducing the moral culpability of the killing, or which makes it less deserving of extreme punishment than other first-degree murders. The law of North Carolina specifies the mitigating circumstances which might be considered by you, and only those circumstances created by statute, about which I shall instruct you, may be considered by you.

The defendant has the burden of persuading you of the existence of any mitigating circumstance. The defendant must satisfy you from the evidence taken as a whole, not beyond a reasonable doubt, but merely to your satisfaction, of the existence of any mitigating circumstance. If you are so satisfied, you would answer "Yes" as to that circumstance; otherwise, "No."

I will now explain to you the applicable law as to each of these circumstances. The first circumstance you shall consider reads as follows:

a. Was the murder in this case committed while the defendant was under the influence of mental or emotional disturbance?

Being under mental or emotional disturbance is similar to being in a heat of passion upon adequate provocation. Generally, heat of passion upon adequate provocation means that a person's state of mind, mental or emotional, was at the time so violent as to overcome his reason, such that he could not form a deliberate purpose and control his actions, and which may consist of anything which has a natural tendency to produce such passion in a person of average mind or disposition. However, as to this circumstance, a person may be under the influence of mental or emotional disturbance even though he had no adequate provocation and even though his mental and emotional disturbance was not so strong as to constitute heat of passion or to preclude deliberation. Mental or emotional disturbance may result from any cause or may exist without apparent cause. For this mitigating circumstance to exist, it is sufficient that the defendant's mind or emotions were disturbed, that is, interrupted or interfered with, from any cause, whether from consumption of drugs, mental illness, or other cause, and that he was under the influence of that disturbance when he killed Diane Parker. A person would be under the influence of mental or emotional disturbance if a mental or emotional condition existed which influenced his conduct so as to make it different than it otherwise would have been.

So, if you are satisfied from the evidence that at the time of the murder of Diane Parker, the defendant was under the influence of mental or emotional disturbance, from any cause, then it would be your duty to find this mitigating circumstance, and you would indicate so by answering this sub-part (a) "Yes." If you do not so find, you would indicate so by answering this sub-part (a) "No."

The second circumstance you shall consider reads as follows:

b. Was the defendant's capacity to appreciate the criminality of his conduct or his capacity to conform his conduct to the requirements of law impaired?

As I instructed you in the first phase of this case, a person would be legally insane if, as a result of mental disease or defect, he did not know the nature and quality of his act, or did not know his act was wrong.

Ladies and Gentlemen of the Jury, there is a typographical error in the next sentence. I will read the sentence as it should be: However, as to this circumstance, the capacity to appreciate the criminality of one's conduct or conform

his conduct to the law is not the same. That phrase appearing thereafter is stricken. This means, Members of the Jury, that this circumstance is not the same as I instructed you with regard to legal insanity. Even though a defendant may know that his act is wrong, he may nevertheless lack capacity to appreciate its wrongfulness, that is, to fully comprehend or be fully sensible of the criminality or wrongfulness of his conduct. It is sufficient if his capacity to appreciate the wrongfulness of his conduct was impaired, that is, lessened or diminished.

Even though the defendant did appreciate the criminality of his conduct, if his capacity to follow the law and refrain from engaging in the illegal conduct was impaired, this circumstance would then exist, since a person may appreciate that his conduct is wrong and still lack the capacity to refrain from such conduct.

The defendant need not have lacked all capacity to conform. It is sufficient if such capacity as he might otherwise have had is impaired, that is, lessened or diminished.

The cause of such impaired capacity may be mental disease, defect, or illness or the effect of drug intoxication, or any other cause sufficient to cause an impairment of the capacity to appreciate the criminality of his conduct, or to conform his conduct to the requirements of law.

So, if you are satisfied from the evidence that at the time of the murder of Diane Parker, the defendant's capacity to appreciate the criminality of his conduct was impaired, and/or that the defendant's capacity to conform his conduct to the requirement of law was impaired, then it would be your duty to find this mitigating circumstance, and you would indicate so by answering this sub-part (b) "Yes." If you do not so find, you would indicate so by answering this sub-part (b) "No."

The third circumstance you shall consider reads as follows:

c. Was the age of the defendant at the time of the murder in this case a mitigating factor?

If you find that the age of the defendant at the time of the murder in this case was an extenuating factor, or lessens the severity of, or suggests a lesser penalty for the murder of Diane Parker, then it would be your duty to find this mitigating circumstance, and you would indicate so by answering this sub-part (c) "Yes." If you do not so find, you would indicate so by answering this sub-part (c) "No."

The fourth circumstance you shall consider reads as follows:

d. Is there any other circumstance or circumstances arising from the evidence which you deem to have mitigating value?

As to this circumstance, you may consider any circumstance from the evidence which you are satisfied lessens the seriousness of the murder or suggests a lesser penalty than otherwise may be required, such as the defendant's character, education, environment, habits, mentality, propensities and record, and any other circumstances arising from the evidence which you deem to have mitigating value. Specifically, you may consider: (1) the defendant's love for his wife; (2) the defendant's love for his child; (3) the defendant's attitude toward abortion; (4) the defendant's attempt to remove himself from the drug culture in Georgia to lead a good and useful life; (5) his progress with psychotherapy; (6) his behavior when not suffering from the effects of mental illness; (7) any remorse as a result of his acts; (8) his behavior when not intoxicated with drugs; (9) his desire to love his family; (10) his employment experience at Pump and Lighting; and any other redeeming quality of the defendant. Likewise, you shall consider any other circumstance arising from the evidence which you deem to have mitigating value.

So then, if you find from the evidence any one or more of the mitigating circumstances specifically enumerated in the preceding paragraph or any other mitigating circumstance arising from the evidence which you deem to have mitigating value, then it would be your duty

to answer this sub-part (d) "Yes." Otherwise, "No."

So then, Members of the Jury, as to this second issue I instruct you that if you find one or more of the mitigating circumstances from the evidence, it would be your duty to answer the issue "Yes," and you would do so by placing your answer in the blank space provided immediately under the second issue. If you do not find at least one of these mitigating circumstances from the evidence, you would then answer this second issue "No," and you would do so by placing your answer in the blank space provided immediately under the second issue.

In any event, whether you answer this issue "Yes" or "No," if you have answered the first issue "Yes," you will proceed to consider the third issue.

The jury, by its answers to questions 2, 2(a), 2(b), and 2(d), found that there were mitigating circumstances because at the time of the murder appellant was under the influence of a mental or emotional disturbance, and his capacity to appreciate the criminality of his conduct and his capacity to conform his conduct to the requirements of law were diminished.

Although the charge states that the law of North Carolina specifies the mitigating circumstances that may be considered, the language of the charge under Issue 2(d) is so broad that it includes anything that the defendant may proffer. This part of the charge was proper under N.C.Gen.Stat. § 15A–2000(f)(9). After listing eight mitigating circumstances which may be considered by a jury in a capital case, there is a catchall provided in (f)(9): "Any other circumstance arising from the evidence which the jury deems to have mitigating value." The judge instructed the jury that it could consider the 10 mitigating circumstances submitted by McDougall during the sentencing phase, and McDougall was not limited in any way in submitting evidence in mitigation.

### II(b)

■ Appellant claims the jury charge on the fourth question was unconstitutional because the failure to include the phrase "when considered with the mitigating circumstance or circumstances found by you" was a limitation on the jury's discretion. We do not find this argument persuasive.

In *Rook v. Rice,* 783 F.2d 401 (4th Cir.), *cert. denied,* 478 U.S. 1022, 106 S.Ct. 3315, 92 L.Ed.2d 745 (1986), we considered a similar claim that the fourth question submitted on the form "Issues and Recommendation as to Punishment" should have contained the particular language added by the Supreme Court of North Carolina in McDougall's original appeal. 301 S.E.2d at 327. The North Carolina Supreme Court did not find the absence of this phrase to be prejudicial to the defendant and we concluded in *Rook:*

> At the outset, we find nothing in the Supreme Court of North Carolina's decision in *McDougall* which constitutionally mandates a particular order or form for the sentencing instructions in Rook's case. In *McDougall,* the court was attempting to establish uniformity in sentencing based on North Carolina's applicable statute. It was not setting forth a federal constitutional standard.

*Rook,* 783 F.2d at 406.

Appellant has not convinced us that we should change our holding in *Rook.* He argues that the state may not limit the jury's discretion in deciding the ultimate issue of whether to impose the death sentence, and that the language used by the court in submitting Issue 4 is a limitation on the jury's discretion. In reviewing the entire charge, it is manifest that the jury was clearly and completely instructed on mitigation and the vital role of mitigation in the North Carolina sentencing procedure. The North Carolina Supreme Court clearly explained this in McDougall's original appeal:

> The fourth issue is not an isolated, independent question that may be answered without reference to the other issues and circumstances of the case. This is manifested by the language of the General Assembly—"[b]ased on these considerations" should the defendant be sentenced

to death or life imprisonment. N.C.Gen. Stat. § 15A–2000(b)(3) (Cum.Supp.1981). In deciding the fourth issue, the jury must consider the aggravating circumstances found, the mitigating circumstances found, and the degree to which the aggravating circumstances outweigh the mitigating circumstances. The jury must compare the totality of the aggravating circumstances with the totality of the mitigating circumstances and be satisfied beyond a reasonable doubt that the statutory aggravating circumstances found are sufficiently substantial to call for the imposition of the death penalty and that the death penalty is justified and appropriate.

301 S.E.2d at 326.

In submitting and explaining to the jury the printed form "Issues and Recommendation as to Punishment," the trial judge used the words "mitigation" and/or "mitigating" 27 times, and these instructions left no doubt as to the importance of mitigation and how it should be considered and weighed by the jury in deciding the ultimate question.

### II(c)

■ We are not persuaded that *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), affords any comfort to McDougall or support for his position. In *Mills*, the court found that under the Maryland death penalty statute, the trial judge's charge and the verdict form, the jury could have believed that the death sentence was mandatory if it had unanimously found an aggravating circumstance, but it could not unanimously agree on the existence of any particular mitigating circumstance. These are not our facts, and the rationale of *Mills* does not extend so far. McDougall argues that since mitigating circumstances are not mentioned in the fourth issue, the jury could not consider them, and therefore the death penalty became mandatory. This position will not withstand examination.

First, the fourth issue is not viewed in isolation, and it is a part of the "Issues and Recommendation as to Punishment" and is considered only after the jury has considered and answered the first three issues. It can only be reached after mitigation has been considered and compared to any elements of aggravation. Second, even when the aggravating circumstances outweigh the mitigating circumstances, a death sentence is not mandatory or automatic. The jury must still consider whether the aggravating circumstances are sufficiently substantial to call for the imposition of the death penalty. Third, under the charge given in *McDougall*, any finding of an aggravating circumstance must be unanimous and beyond a reasonable doubt, but mitigating circumstances did not require unanimity but "must satisfy you from the evidence taken as a whole, not beyond a reasonable doubt, but merely to your satisfaction, of the existence of any mitigating circumstance." Such language is clear and did not create confusion similar to that in *Mills*.

We find that the jury instructions did not in any way interfere with the jury's consideration of mitigating circumstances so as to result in a mandatory death penalty.

### II(d)

■ We find no merit to the claim that the use of the word "duty" in the instructions required the jury to return a verdict of death. The word "duty" was used in a number of places in the instructions, and "duty" was used to indicate the jury's responsibility to act after it had made or failed to make certain findings of fact. The instructions advised the jury that it had a duty to answer "No" under certain findings and a duty to then recommend life imprisonment.

Since *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Supreme Court has tried to reduce the risk that the death penalty will be imposed in an arbitrary and capricious manner. In *California v. Brown*, 479 U.S. 538, 541, 107 S.Ct. 837, 839, 93 L.Ed.2d 934 (1987), it found as the first prerequisite of a valid death sentence that "sentencers may not be given unbridled discretion in determining the fates of those charged with capital

offenses. The Constitution instead requires that death penalty statutes be structured so as to prevent the penalty from being administered in an arbitrary and unpredictable fashion." Therefore, North Carolina has adopted statutory provisions designed to eliminate this risk. If a sentence is not to be arbitrary and capricious, the jury, in a capital case, must have clear instructions as to its duty after it has made certain factual findings. This is clearly explained in *State v. Pinch*, 306 N.C. 1, 32, 292 S.E.2d 203, 227, *cert. denied*, 459 U.S. 1056, 103 S.Ct. 474, 74 L.Ed.2d 622 (1982). In *Pinch*, both the prosecutor and the judge advised the jury that it had a duty to recommend death if it found one or more aggravating circumstances, that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt, and that the aggravating circumstances were substantial enough to warrant the death penalty. The court also instructed the jury that it had a duty to recommend a sentence of life imprisonment if it did not find any one of these three elements. The defendant argued that these instructions prejudicially withdrew from the jury its final option to recommend life notwithstanding its earlier findings. The court answered this argument:

> The jury had no such option to exercise unbridled discretion and return a sentencing verdict wholly inconsistent with the findings it had made pursuant to G.S. 15A–2000(c). The jury may not arbitrarily or capriciously *impose or reject* a sentence of death. Instead, the jury may only exercise guided discretion *in making the underlying findings* required for a recommendation of the death penalty within the "carefully defined set of statutory criteria that allow them to take into account the nature of the crime and the character of the accused." *State v. Johnson*, 298 N.C. 47, 63, 257 S.E.2d 597, 610 (1979); *see State v. Barfield*, 298 N.C. 306, 349–52, 259 S.E.2d 510, 541–43 (1979), *cert. denied*, 448 U.S. 907, 100 S.Ct. 3050, 65 L.Ed.2d 1137 (1980). Moreover, defendant's contention was implicitly answered in *State v. Goodman*, 298 N.C. 1, 257 S.E.2d 569 (1979),

in which this Court overruled an assignment of error alleging that the trial court had erred in failing to instruct the jury that it could still recommend life imprisonment even though it found that the aggravating circumstances outweighed the mitigating ones. Justice Britt, speaking for the Court in *Goodman*, explained that:

> [I]t would be improper to instruct the jury that they may, as defendant suggests, disregard the procedure outlined by the legislature and impose the sanction of death at their own whim. To do so would be to revert to a system pervaded by arbitrariness and caprice. The exercise of such unbridled discretion by the jury under the court's instruction would be contrary to the rules of *Furman* [*v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346] and the cases which have followed it.

*Id.* at 35, 257 S.E.2d at 590. For these reasons, we hold that the jury was correctly informed that it had a duty to recommend a sentence of death if it made the three findings necessary to support such a sentence under G.S. 15A–2000(c).

*Id.* at 33–34, 292 S.E.2d at 227.

We find no constitutional infirmity in the use of the word "duty" to explain the jury's responsibility to act after it has unanimously made the statutory findings during the sentencing phase of the trial.

### II(e)

■ Defendant argues that the North Carolina capital sentencing procedure and its application to his trial do not meet the requirements set forth in *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), because after narrowing the jury's discretion by establishing aggravating and mitigating circumstances, it further interfered with its discretion by not allowing it to consider or reconsider mitigation on the fourth question.

In *McCleskey*, Justice Powell identified the constitutionally permissible range of discretion in imposing the death sentence as:

First, there is a required threshold below which the death penalty cannot be imposed. In this context, the State must establish rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold. Moreover, a societal consensus that the death penalty is disproportionate to a particular offense prevents a State from imposing the death penalty for that offense. Second, States cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the penalty. In this respect, the State cannot channel the sentencer's discretion, but must allow it to consider any relevant information offered by the defendant.

*Id.* at 305–06, 107 S.Ct. at 1774.

Justice Powell went on to observe that McCleskey could not successfully argue that his death sentence for murder was disproportionate to the crime. The facts in the *McCleskey* case are not nearly so vicious and aggravated as the murder committed by McDougall, so we need not discuss the first *McCleskey* element.

The North Carolina law complies with the second requirement of *McCleskey* because it does not limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the death penalty. N.C.Gen.Stat. § 15A–2000(f) sets forth mitigating circumstances as follows:

(f) Mitigating Circumstances.—Mitigating circumstances which may be considered shall include, but not be limited to, the following:

(1) The defendant has no significant history of prior criminal activity.

(2) The capital felony was committed while the defendant was under the influence of mental or emotional disturbance.

(3) The victim was a voluntary participant in the defendant's homicidal conduct or consented to the homicidal act.

(4) The defendant was an accomplice in or accessory to the capital felony committed by another person and his participation was relatively minor.

(5) The defendant acted under duress or under the domination of another person.

(6) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired.

(7) The age of the defendant at the time of the crime.

(8) The defendant aided in the apprehension of another capital felon or testified truthfully on behalf of the prosecution in another prosecution of a felony.

(9) Any other circumstance arising from the evidence which the jury deems to have mitigating value.

(1977, c. 406, s. 2; 1979, c. 565, s. 1; c. 682, s. 9; 1981, c. 652, s. 1.)

The catchall language of (f)(9) allows the jury to consider any other circumstance arising from the evidence that it deems to be mitigating.

The *McDougall* jury was properly instructed on aggravating and mitigating circumstances, and was not limited or restricted in any way by the statute or by the court in its consideration of mitigating circumstances.

## II(f)

Appellant argues that after the jury had weighed the aggravating circumstances against the mitigating circumstances and found that the mitigating circumstances were not sufficient to outweigh the aggravating circumstances, the death penalty was mandatory in violation of *Sumner v. Shuman*, 483 U.S. 66, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987). *Sumner* has no application to the present facts because it involved a statute that mandated a death penalty for a prison inmate convicted of murder while serving a life sentence without possibility of parole. The North Carolina plan does not mandate the death penalty. After a jury finding that the mitigating circumstances are insufficient to outweigh the aggravating circumstances, the jury must proceed to the question of whether the aggravating circumstances are sufficiently substantial to call for the imposition of the death penalty. A North Car-

olina jury may find that the mitigating circumstances fail to outweigh the aggravating circumstances, and may still find that the aggravating circumstances are not sufficiently substantial to impose the death penalty, so there is no *Sumner* problem on the present facts, because the North Carolina law does not mandate the death penalty, and it did not limit the sentencer's consideration of any relevant information offered by the defendant.

Our conclusion on this issue is reinforced by the recent opinions in *Blystone v. Pennsylvania,* —— U.S. ——, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990), and *Boyde v. California,* —— U.S. ——, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). In *Blystone* the Court approved the Pennsylvania statute which provided that the verdict must be a sentence of death if the jury unanimously finds at least one specified aggravating circumstance and no mitigating circumstances. This statute deprived the jury of any sentencing discretion once it had found one aggravating circumstance but no mitigating circumstance. The Court found that the Pennsylvania statute was constitutional because the jury was allowed to consider and give effect to all relevant mitigating evidence and the statute was not impermissibly mandatory.

In *Boyde,* the Court found no constitutional problem with the California jury instructions that directed the jury in a capital case to consider all aggravating and mitigating circumstances and, "if you conclude that the aggravating circumstances outweigh the mitigating circumstances you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole." The *Boyde* Court found that the California instruction complied with the requirement of individualized sentencing in capital cases because the jury was allowed to consider all relevant mitigating evidence.

The jury instructions approved in *Blystone* and *Boyde* are much more direct and mandatory than those used in McDougall's trial. In all three trials the jury was allowed to consider all relevant mitigating evidence. In Pennsylvania if the jury found an aggravating circumstance and no mitigating circumstance, it was instructed, "The verdict must be a sentence of death." In California if the aggravating circumstances outweighed the mitigating circumstances, the jury was instructed, "You shall impose a sentence of death." In McDougall's case the jury was instructed to weigh the aggravating circumstances against the mitigating circumstances, and in order to proceed to the next step in the sentencing process, the jury must find beyond a reasonable doubt that the mitigating circumstances were insufficient to outweigh the aggravating circumstances. McDougall was given an additional protection that was not provided in California and Pennsylvania, because McDougall's jury was instructed that after finding beyond a reasonable doubt that the mitigating circumstances were insufficient to outweigh the aggravating circumstances, it must decide beyond a reasonable doubt that the aggravating circumstances were "sufficiently substantial to call for the imposition of the death penalty." The McDougall jury was advised that after making the necessary findings, it had a "duty" to recommend a certain sentence, while the jury in *Blystone* was advised, "The verdict must be a sentence of death" and the jury in *Boyde* was instructed, "You shall impose a sentence of death." The language of *Blystone* ("must") and of *Boyde* ("shall") is stronger and more mandatory than "duty" used in the McDougall instructions. The common thread running through the instructions that have been approved is the direction that the jury be allowed to consider all relevant mitigating circumstances. This was made abundantly clear to the jury in the present charge.

### III

We find no merit to McDougall's claim that his sentence is unconstitutional because at the time of his trial North Carolina juries were permitted to return verdicts of guilty to the lesser included offense of second degree murder when there

was no evidence to support such a verdict. He erroneously relies upon *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), in which the Court struck down the Louisiana mandatory death penalty for first degree murder, and gave as one of its reasons:

> Under the current Louisiana system, however, every jury in a first-degree murder case is instructed on the crimes of second-degree murder and manslaughter and permitted to consider those verdicts even if there is not a scintilla of evidence to support the lesser verdicts.

*Id.* at 334, 96 S.Ct. at 3006. The court found that this practice lacked the necessary standards to guide the jury in selecting among first-degree murderers, and invited the jurors to disregard their oaths and introduced an element of capriciousness by allowing the jurors to avoid the death penalty by disregarding the trial judge's instructions. *Roberts* makes clear that this is not the law in North Carolina: "By contrast, in North Carolina instructions on lesser included offenses must have a basis in the evidence adduced at trial." *Id.* at 332, 96 S.Ct. at 3005.

In ruling upon McDougall's motion for appropriate relief, Honorable Frank W. Snepp of the North Carolina Superior Court found:

> The record in defendant's case shows that his case was submitted to the jury on both the theory of premeditation and deliberation, and felony murder. The jury found the defendant guilty of felony first degree murder, but not of premeditated first degree murder.
>
> A possible verdict of second degree murder was submitted to the jury as an alternative to a finding of guilt of first degree murder under premeditation and deliberation, which was to be answered only if the jury failed to find the defendant guilty of first degree murder upon either theory.
>
> In this case, the evidence as to the ingestion of drugs by the defendant would have supported a verdict of second degree murder, so that its submission was proper under *Hopper v. Evans,* [456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982)].

We find no violation of *Roberts v. Louisiana* because there was evidence upon which the jury could have returned a verdict of second degree murder, and North Carolina does not have a mandatory death sentence for first degree murder as Louisiana had at the time of *Roberts.*

## IV

■ Several months after filing his habeas petition in the federal court, appellant moved to expand the record under Habeas Rule 7 to include the affidavits of seven experts in the fields of Anthropology, Linguistics, Philosophy, Logic, Clinical Psychology, Rhetoric, Communications and English Literature in an effort to convince the court that the trial judge's instructions relating to the weighing of aggravating and mitigating circumstances under the third issue, and the language of the fourth issue violated McDougall's Eighth and Fourteenth Amendment rights, because a reasonable juror could have interpreted these instructions as not allowing the jury to consider mitigating circumstances in deciding the fourth issue. Appellant also sought to introduce the results of certain tests conducted by one of the experts using students at the University of North Carolina to demonstrate how a reasonable juror would have interpreted the instructions.

We find no error in the district court's refusal to accept the proffered affidavits and test results. The test of the charge is what a reasonable juror would have understood the entire charge to mean. *Francis v. Franklin,* 471 U.S. 307, 315–16, 105 S.Ct. 1965, 1971–72, 85 L.Ed.2d 344 (1985). We agree with the district court that the proffered affidavits were not relevant to a determination of the constitutionality of the instructions. The interpretation of instructions given by seven academics, employed eight years after the trial, are irrelevant. The result of a test given to students at the University of North Carolina would not enlighten the court as to how a reasonable juror, who had heard three weeks of testimony, jury arguments from the attorneys,

and the complete charge of the judge, would have interpreted a few sentences in the charge.

In *California v. Brown*, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), the Court cautioned when interpreting the meaning of a charge:

> [W]e "must focus initially on the special language challenged." If the specific instruction fails constitutional muster, we then review the instructions as a whole to see if the entire charge delivered a correct interpretation of the law.

*Id.* at 541, 107 S.Ct. at 839 (citation omitted). *Brown* also teaches that common sense should be applied, that the meaning of a word may be known from the accompanying words, and that the instructions must be reviewed as a whole to see if the entire charge delivered a correct interpretation of the law. Applying the *Brown* test we find no constitutional infirmity in the challenged language of the jury instruction, and we find no error in the refusal of the proffered affidavits and test results.

### V

We now turn to the appellant's claims that the behavior of his lead attorney, Jerome Paul, was so outrageous that he was denied his Sixth Amendment right to effective assistance of counsel at his trial, that he was denied due process required by the Fourteenth Amendment, and that the reliability of the jury verdict was undermined by the violation of the Eighth Amendment. Although we agree that certain acts of Attorney Paul were unethical, outrageous and even illegal, appellant has failed to show that these acts caused any prejudice to him or undermined the reliability of the jury verdict.

As we have previously noted, McDougall's family originally retained Attorney Wallace Osborne, and, because of Osborne's limited experience in criminal cases, Attorney Michael Scofield was retained with McDougall's consent. Mr. Scofield was an experienced criminal trial lawyer. When the attorneys sent McDougall to Dorothea Dix Hospital for psychiatric examination and evaluation of his sanity,

he was seen by Dr. Steven Teich, a psychiatrist, Ms. Courtney Mullin, a "juristic" or correctional psychologist, and Dr. Brad Fisher. Dr. Teich and Ms. Mullin had been associated with Jerome Paul in defense of prior criminal cases, and they recommended that McDougall retain Attorney Paul. They arranged a meeting between Paul and McDougall at the hospital. Attorney Paul had also been a patient of Dr. Teich. Paul met with Attorney Scofield, the defendant and defendant's family, and he was retained to represent defendant. The evidence shows that Paul's plan of defense was to be a team effort. The team included the three lawyers, Dr. Teich, Ms. Mullin, a paralegal, a professor of psychology, a hypnotist, a toxicologist, a pollster, and others.

The trial began on June 9, 1980 and after extensive voir dire examination, a jury of six whites and six blacks was seated. After a lengthy trial, the jury, on July 18, 1980, found that the defendant was not insane. On July 21, 1980, the jury found him guilty of murder and on July 25, 1980, it recommended the death sentence.

Appellant now lists fourteen examples of Attorney Paul's conduct, which he claims denied him effective assistance of counsel. These are:

> (1) At the time of Paul's first contact with McDougall and his family, Paul's license to practice in North Carolina had already been suspended once and he faced four additional formal charges from the state bar;
>
> (2) Paul gained admission to the case through misrepresentation, lying about his own track record and disparaging Scofield and Osborne;
>
> (3) Paul took command of the case, relegating Scofield and Osborne to minor roles and disregarding their advice;
>
> (4) Paul caused strong dissension and division among counsel, experts, family and client;
>
> (5) Paul's theatrical strategies so enraged Scofield that a yelling match with Paul and McDougall ensued and Scofield boycotted jury selection for a full day;

(6) Just before trial was to start, Paul's license to practice was suspended a second time and he was twice reprimanded;

(7) On the day trial began, the State Bar reaffirmed the original suspension of Paul's license;

(8) During trial, Paul was so sick with migraines that he visited local emergency rooms at least nine times and sought other treatment as well; Paul had earlier told the State Bar that migraines incapacitated him for days at a time;

(9) During trial, Paul took large quantities of legal drugs that would cause mental confusion and a hangover effect;

(10) During trial, headache pain caused Paul to leave while court was in session, to lie sprawled on a nearby office floor, and to be absent from court, once for at least a full half-day;

(11) During trial, Paul was at times too sick to examine witnesses, and precipitously assigned such tasks to Scofield;

(12) During trial, Paul suborned perjury from both McDougall, his mother, and his wife;

(13) During trial, Paul took illegal drugs and gave them to McDougall; as a result, Scofield stopped meeting with McDougall and Paul in the jail's conference room;

(14) Paul gave a penalty phase last-closing argument that was so bad that co-counsel viewed it as "stupid" and harmful, and one of North Carolina's preeminent trial lawyers viewed it as incompetent.

Paul's misbehavior has been examined in depth by a North Carolina Superior Court judge, who heard the motion for appropriate relief, and by the United States District Court judge, who heard the federal petition for writ of habeas corpus. Both made extensive findings of fact, which we have reviewed and find to be well supported by the evidence. Each judge found that Paul's actions did not result in ineffective assistance of counsel or deny McDougall a fair trial.

■ As to the claim that Paul was not licensed to practice law in North Carolina at the time of the trial in June and July 1980, the state court found that the orders of suspension from practice were not effective until April 2, 1981. The defendant made the same arguments before the state judge as he has made in federal court and these were clearly answered by Judge Snepp:

The defendant argues that I should disregard the finding of the State Bar Counsel, and hold that Paul's license was in fact suspended before he accepted employment in this case, or that, at least, the suspension became effective during the trial.

To do so would be to disregard the entire statutory scheme governing the discipline of members of the bar in North Carolina, which is beyond the powers of this court.

The fact is, that at the time Paul represented the defendant, his license to practice law in North Carolina had not been suspended by reason of any action of the Disciplinary Hearing Commission which was final under the law, and, as the testimony of Scofield, and the later order of reinstatement show, the State Bar did not consider it to be final at the time.

I therefore find that Paul, at the time he represented the defendant, was duly licensed to practice law in North Carolina.

■ McDougall claims that Paul gained admission to the case through misrepresentation and lied about his own track record. Judge Snepp found that Paul had violated a number of the Canons of the Code of Professional Responsibility by "puffing his wares," but McDougall had not shown that this in any way prejudiced his defense. How an attorney obtains employment is not the measure of ineffective assistance of counsel.

■ Paul's mental and physical condition during trial did not result in ineffective assistance of counsel. Paul was one of a team of attorneys and experts defending the appellant. Paul had suffered from severe migraine headaches for a number of years and these had been exacerbated by

the illness and death of his son three years prior to the trial of this case. Dr. Teich treated Paul for depression and another physician had treated him for migraines. This doctor was of the opinion that Paul was emotionally and intellectually capable of practicing law at the time of the trial. Both Paul and Dr. Teich expected the stress of the long trial to result in migraines, and Dr. Teich was present during the entire trial. He arranged for a Charlotte neurosurgeon to review Paul's condition. Of the nine visits to area hospitals, eight of these visits were at night, and one was in the morning before court convened. Three of the visits occurred on days when the court was not in session. Paul's capacity in the courtroom was not adversely affected by these hospital visits or the medical attention he received.

Attorney Scofield was an experienced criminal trial lawyer, and Paul's inability to conduct the examination of two witnesses had no adverse effect on the legal representation the appellant received, because these witnesses were adequately questioned by Attorney Scofield. Appellant has made no showing that Mr. Scofield's services were inadequate, or that he was prejudiced by Mr. Scofield's examination of the two witnesses.

There has been no showing that the legal drugs taken by Paul during trial resulted in prejudice to the defendant. Many lawyers and judges are on various forms of medication while attending to their duties in the courtroom, but this is not the test. The appellant must show that the medication affected his attorney in such a way that the attorney could not and did not render adequate legal assistance during the trial. A review of the record shows that Paul was active throughout the trial and Judge Snepp found that there was no evidence of any error resulting from his mental or physical condition and concluded:

> Paul actively and vigorously participated in the vast majority of all aspects of the trial. He conducted lengthy voir dire examination of jurors; examined and cross-examined witnesses; lodged proper objections; participated in planning sessions with co-counsel; conferred with defendant; argued motions; made jury arguments; and otherwise discharged the duties of a defense counsel.

If Paul suborned perjury by McDougall, his mother and his wife, as appellant alleges, these were illegal acts, but there has been no showing as to how appellant was prejudiced by them.

■ Appellant attacks the closing jury argument made by Jerome Paul at the conclusion of the sentencing phase of the trial. He contends that the argument was little more than a disjointed personal history of Paul, and that the argument was so outrageous that Paul's performance during the penalty phase was inadequate and incompetent. Appellant supports this claim with the testimony of Attorney Scofield at the post-conviction relief hearing stating that the argument was "tactless, ill-advised, [and] stupid." Attorney Osborne testified that he found the argument "extremely foreign to his philosophy and beliefs." Charlotte attorney Allen Bailey, a trial lawyer of 34 years experience and a past president of the North Carolina Academy of Trial Lawyers, filed an affidavit in the same proceeding stating that the argument failed to meet the standard of legal practice in any county in North Carolina and was so outrageous that Paul's performance during the penalty phase was inadequate.

We know, from the testimony taken at the post-conviction relief hearing, that the defense attorneys discussed with each other the general theme of their closing arguments prior to presenting them. Attorneys Osborne and Scofield made the first two arguments and covered the irrevocability of a death penalty verdict, the mitigating factors in favor of the defendant, Biblical passages in support of mercy, other arguments indicating the death penalty was not a proper solution for McDougall, and McDougall's impaired ability to conform his behavior to the law. These were conventional arguments that are often heard in death penalty cases.

The argument of Paul was different, and it was planned to be different. During voir

dire examination of prospective witnesses, Attorney Paul began to sow the seeds for his frontal attack upon the death penalty. Prior to making this argument, Paul discussed it with Dr. Teich. His attack upon the death penalty was a preplanned part of the defense strategy, although, after the fact, Attorneys Osborne and Scofield had some second thoughts about the way this attack was delivered.

In his final comments to the jury, Paul attacked the death penalty head-on as a cold blooded, premeditated killing by the state. He argued that when society executes people it breeds violence, that the death penalty was a tool of totalitarians and fascists, and that believers in capital punishment love killing. He quoted Clarence Darrow in his defense of Loeb and Leopold. He talked about love and non-violence and his admiration of Martin Luther King, Jr., who had preached non-violence. He invoked the memory of his young son, who had died of leukemia, and reminded the jury that while there was life there was love. He then quoted extensively from the Sermon on the Mount including a complete recitation of the Beatitudes. He spoke of the brotherhood of man and advised the jury that only persons who oppose capital punishment are honored by history.

Judge Forrest Ferrell, the North Carolina Superior Court judge, who presided at the defendant's trial and had presided over a number of other capital cases, filed an affidavit in the state post-conviction proceedings stating that he found Paul's closing argument was as good as, if not better than, other death penalty arguments he had heard. He did not think it offensive to the jury but rather believed it to be a play upon the conscience of the jury. His affidavit concluded:

> It is my professional opinion, as a trial-judge who has presided over many serious felony trials and nine capital cases, that Jerry Paul's argument was appropriate, effective and well within the range of competence and expertise expected of attorneys in criminal cases.

Judge Snepp, who presided at the post-conviction relief hearings and heard the testimony of the witnesses, found:

> I find as a fact that at the time Paul chose to make the argument, the circumstances were these:

> The defendant had been found guilty of a particularly brutal first degree murder, an equally brutal assault, and kidnapping. The State had presented evidence at the sentencing hearing that the defendant had been previously convicted of the forcible rape of a young woman, who testified at the sentencing hearing. The defendant's explanation of the crimes was voluntary ingestion of cocaine, and traumatic childhood experiences. The testimony of Dr. Teich suggested that he may, as a child, have killed his grandfather.

> Six of the twelve jurors were black. Paul knew that to achieve the best possible result for the defendant, a recommendation of life imprisonment, he had to convince only one juror to maintain that position. N.C.G.S. 15A–2000(b). Scofield told the jurors, in his opening argument for the defense, that it was necessary for the jurors to agree on a death sentence, or there would not be one.

> The evidence is undisputed that Paul intentionally framed his argument to influence black members of the panel, worked hard on it, and discussed it with Dr. Teich.

> It is in the light of these circumstances that the defendant's claim of ineffectiveness must be weighed.

>           . . . .

> Weighing the content of Paul's argument in the light of the *Strickland* [*v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674] guidelines, I cannot conclude that, under the circumstances facing him, it was conduct which was "outside the wide range of professionally competent assistance" as required by *Strickland, supra.* If, as he obviously planned and hoped, one juror had refused to join in the recommendation of death, the only possible satisfactory result

would have been attained. That he did not succeed does not demonstrate that the argument constituted ineffectiveness, and the fact that the jury deliberated for seven hours before returning a verdict tends to belie the opinion of Scofield that Paul's argument was "stupid," and Bailey's that it was offensive to the jurors.

. . . .

I find that Paul's closing argument at the sentencing stage of the case was, under the circumstances then existing, trial strategy which was within the range of reasonably effective assistance of counsel. I further find that the defendant has failed to show that there is a reasonable probability that, but for the argument, the finding of the jury would have been different.

One of the most difficult duties of a trial lawyer is to make an effective jury argument seeking mercy for his client from a jury that has just convicted the client of a brutal and bloody murder. How does he seek mercy for one who has shown no mercy? How does he discuss the mitigating circumstances when there are so precious few? He might quote the Bible, or Shakespeare, or even Clarence Darrow as was done in this case. He may invoke the irrevocability of the death sentence, the finality of death and argue that the death penalty is not a deterrent. All of these arguments were made, but what a lawyer is really trying to do in the sentencing phase of a capital case is to appeal to just one juror who will hold out against the death penalty and thereby prevent it.

How does one raise a doubt in the mind of one juror or convince one juror that death is not a proper sentence when the murder has been so vicious? The more cruel and vicious the facts, the more difficult the lawyer's task in presenting an effective argument for mercy. Desperate facts may require a desperate argument or an unusual approach, a different appeal that may shake the belief of one juror and prevent the unanimity necessary for a recommendation of death. Attorneys Scofield and Osborne made the usual appeals to the death phase jury and Jerome Paul made the desperate appeal, but it was an appeal that was a strategic choice, made with full knowledge of the facts and the law, and the options available to him.

The closing argument is being attacked after the verdict. The trial judge did not think it was inappropriate. He was on the scene and had heard all of the testimony and could appreciate the desperate circumstances facing McDougall and his attorneys. The jury deliberated for seven hours, which would indicate that something a defense attorney said or did gave the jurors pause. Paul's argument was not an impromptu expression of his personal beliefs. It was a deliberate approach that he chose after discussion with co-counsel and Dr. Teich. Attorney Scofield admitted in the post-conviction hearing that Paul had spent a great deal of time thinking and talking about his closing argument and its possible impact upon the jury. This argument was unusual and innovative, but it was a choice that represented trial strategy and is subject to review under the standards enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Justice O'Connor noted the problem of determining what services were reasonable when all circumstances are considered. She stated:

No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. See *United States v. Decoster*, 199 U.S.App.D.C. [359] at 371, 624 F.2d [196] at 208. [ (D.C.Cir.) ] Indeed, the existence of detailed guidelines for representation could distract counsel from the overriding mission of vigorous advocacy of the defendant's cause. Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considera-

ble importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial.

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. *Engle v. Isaac,* 456 U.S. 107, 133–134 [102 S.Ct. 1558, 1574–75, 71 L.Ed.2d 783] (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged actions "might be considered sound trial strategy." See *Michel v. Louisiana, supra,* [350 U.S. 91] at 101 [76 S.Ct. 158 at 164, 100 L.Ed. 83.] There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. See Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y. U.L.Rev. 299, 343 (1983).

The availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected. Intensive scrutiny of counsel and rigid requirements for acceptable assistance could

dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client.

Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*Id.* at 688–90, 104 S.Ct. at 2065–66.

When we review the claim of ineffective assistance because of Paul's closing argument, we must remember the circumstances faced by the defendant and his attorneys. McDougall had been convicted upon the testimony of eyewitnesses of the vicious murder of one young female and the brutal assault and kidnapping of another. After conviction his problems increased during the sentencing phase because of the aggravating circumstances proved against him, particularly the testimony of a young woman whom he had previously raped. A team of lawyers and experts had been assembled and represented him during the three weeks of trial. The division of final arguments had been agreed upon and the content of Paul's argument had been discussed. The argument represented a different approach and a calculated risk that it might appeal to one

or more jurors and prevent the unanimous verdict necessary to impose the death sentence. In reviewing the record and trying to recreate the circumstances that produced this argument, we are impressed by the opinion of the trial judge that the argument was well within the range of competence and expertise expected. When we give the performance of Paul the highly deferential scrutiny required by *Strickland,* we find that the appellant has failed to prove Paul's performance was deficient or that appellant was denied adequate counsel as guaranteed by the Sixth Amendment.

Although we do not recommend Paul's closing argument as a model for future use, it did not deprive McDougall of counsel under the Constitution. In considering Paul's actions throughout the trial, it must be remembered that he was but one of three attorneys representing the appellant, and we must not be distracted by some of his unorthodox actions. We must review the complete legal advice and services McDougall received from the defense team representing him. Such a review convinces us, as it did the trial court, the post-conviction relief court and the district court, that McDougall did not establish his claim of ineffectiveness of counsel.

## VI

■ We have delayed this opinion, at appellant's request, to await the opinion of the Supreme Court in *McKoy v. North Carolina,* — U.S. —, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), because it involves the North Carolina capital sentencing scheme. We further delayed the filing of this opinion to allow the Supreme Court of North Carolina to reconsider McDougall's sentence in light of *McKoy.* McDougall petitioned the Supreme Court of North Carolina to remand his case to the Superior Court of Mecklenburg County for the imposition of a life sentence under the holding in *McKoy,* or in the alternative for a writ of certiorari to the Supreme Court of North Carolina in order to reargue his appeal. The motions have been denied.

We have carefully considered *McKoy* and find it has no application to the present case. In *McKoy* the jury was instructed during the sentencing stage that any mitigating circumstances must be unanimously found before they could be considered and weighed against aggravating circumstances in determining the sentence. The Supreme Court found that the unanimity requirement impermissibly limited the jurors' consideration of mitigating evidence in violation of *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), because one juror could prevent unanimity and thereby prevent the other eleven jurors from giving effect to mitigating evidence.

In charging on question 2, which related to mitigating circumstances, the McDougall jury was not instructed that its findings on mitigation must be unanimous.

The *McKoy* issue was not raised by appellant at his trial or on direct appeal. The issue was not raised in his state post-conviction motion for appropriate relief and it was not raised in his petition for writ of habeas corpus in the United States District Court, nor was it raised in his appeal to this court. The Supreme Court of North Carolina has denied his motion for a writ of certiorari to bring the issue before it ten years after his trial. *McKoy* is an extension of *Mills v. Maryland,* which was decided eight years after McDougall's conviction. The McDougall facts are not the same as *McKoy,* but even if they were, the *McKoy* and *Mills* cases represent new law and would not be applied retroactively on collateral review. *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

For the reasons set forth above, we find no error, and we affirm.

AFFIRMED.